IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-1534

PARKER EXCAVATING, INC., a Colorado corporation,

    Plaintiff,
v.

LAFARGE WEST, INC., a Delaware corporation,
MARTIN MARIETTA MATERIALS, INC., a North Carolina corporation,
NICK GUERRA,
ALF RANDALL, in his individual capacity and
ROBERT SCHMIDT, in his individual capacity

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Parker Excavating, Inc. ("PEI"), by and through its attorneys, Schlueter, Mahoney & Ross, P.C., for its Complaint against the Defendants states and avers as follows:

## I.    THE PARTIES

1. Plaintiff PEI is a Colorado corporation with a principal street address of 1428 Stockyard Road, Pueblo, Colorado 81001.  PEI is a Native-American owned, by race, business, and was a subcontractor for Lafarge West, Inc. ("Lafarge") and/or Martin Marietta Materials, Inc. ("Martin Marietta") on a road construction project for Pueblo County known as the South McCulloch Boulevard Roadway/Drainage Improvement Project from Highway 50 to John Powell Blvd. (the "Project")

2. Defendant Lafarge is a Delaware corporation, registered as a foreign entity doing business in Colorado, with a principal street address in Colorado of 615 Santa Fe Drive, Pueblo, Colorado 81006.

3. Defendant Martin Marietta is a North Carolina corporation, registered as a foreign entity doing business in Colorado.

4. Defendant Nick Guerra is a resident of Pueblo County, Colorado and was an employee for Lafarge and/or Martin Marietta during times relevant to this Complaint.

5. Defendant Alf Randall is, on information and belief, a resident of Freemont County, Colorado. He is also an employee of Pueblo County and, on information and belief, was both Interim Director of Public Works and Senior Engineer for Public Works for Pueblo County (the "County") during the course of the Project. He is named in this lawsuit in his individual capacity.

6. Defendant Bob Schmidt, is, on information and belief, a resident of Florida. He was a member of the Public Works Department of Pueblo County, Colorado. On information and belief, Bob Schmidt became the Acting Director of Public Works for the County upon Alf Randall becoming Senior Engineer for Public Works for the County, but no longer holds this position. He is named in this lawsuit in his individual capacity.

## II. JURISDICTION AND VENUE

7. Jurisdiction is proper in this Court. This is an action based on a federal question, pursuant to 28 U.S.C. § 1331.

8. The federal question involved in this matter is 42 U.S.C. § 1981.

9. Plaintiff PEI is a Native American, by race, company. Defendant Randall discriminated against it on the basis of its race with acquiescence of Lafarge and Martin Marietta.

10. The Plaintiff engaged in the protected activity of making a complaint or complaints of racial discrimination and suffered retaliation for doing so by all Defendants. The Plaintiff also suffered racial discrimination at the hands of Defendant Randall.

11. The Court has personal jurisdiction over each Defendant, and venue is proper pursuant to 28 U.S.C. § 1391. Each Defendant has substantial contacts with the forum as a result of significant business activities conducted within the State of Colorado, including but not limited to (a) employment or former employment in Colorado; (b) the performance of contracts in Colorado; (c) the modification of contracts in Colorado; or (d) the interference, in Colorado, with the enjoyment of benefits, privileges, terms, and/or conditions of a Colorado contractual relationship.

### III.   GENERAL ALLEGATIONS

**A. Formation of PEI's Subcontract With Lafarge**

12. On June 5, 2011, PEI received a request for quotation from Lafarge for subcontract work on the Project (the "Initial Bid Request", attached as **Exhibit 1**).

13. In response to the Initial Bid Request, PEI submitted a bid to Lafarge (the "Initial Bid"). The initial bid included excavation, traffic control, rotomilling, and wet/dry utility work. After PEI submitted the initial bid, PEI revised the Initial Bid that same day. The Initial Bid, as revised, is attached as **Exhibit 2**).

14. On or about June 7, 2011, PEI both submitted its Initial Bid, as revised and learned that its Initial Bid, as revised, had been unsuccessful.

15. On or about June 8, 2011, Nick Guerra of Lafarge requested that PEI meet with him to bid for excavation, traffic control, and rotomilling work – but not wet/dry utility work – on the Project (the "Subcontract Scope of Work").

16. Also, on or about June 8, 2011, Greg Parker met with Guerra, pursuant to Guerra's request, and reached an oral agreement for PEI to perform the Subcontract Scope of Work (the "Oral Agreement").

17. The Traffic Control portion of the Subcontract Scope of Work included controlling and directing traffic while also giving advanced warning for a portion of some of the Pueblo West streets around, and including, McCulloch Blvd.

18. On or about July 18, 2011, Lafarge signed an agreement to rent equipment from PEI for use on the Project (the "Rental Agreements", attached as **Exhibit 3**).

19. On or about July 22, 2014, PEI and Lafarge executed a written contract (the "Construction Subcontract") to memorialize their prior oral agreement to have PEI serve as a subcontractor for the Project.

20. Subsequently, on or about July 29, 2011, PEI and Lafarge, executed "Attachment B" to the Construction Subcontract (the Construction Subcontract, together with Attachment B, is attached to this First Amended Complaint as **Exhibit 4**).

21. Attachment B specifically exempted PEI from a requirement to provide a subcontract payment and performance bond covering its work on the Project. Instead, Lafarge and PEI agreed that Lafarge would temporarily withhold fifty percent (50%) retention from all

4

payment applications submitted by PEI on the Project (the "Retained Amount") (See Subcontract Article 5 and Attachment B).

**B. Initial Unprofessional And Harassing Treatment Of PEI During the Project**

22. Starting in or around June of 2011, PEI informed the County that Randall's planned method of traffic control for the Project would lead to significant safety issues and would also not be feasible.

23. During this time, Randall treated PEI in an unprofessional manner.

24. As a result of this treatment, personnel from Lafarge and the County encouraged PEI to contact Pueblo County Commissioner John Cordova.

25. On or about July 12, 2011, PEI Vice President Greg Parker called Cordova's cell phone number and left a message. That same day, Cordova returned the phone call at approximately 5:31 p.m. to Greg Parker's personal cell phone. (*Compare* **Exhibit 5**, Excerpts of Greg Parker's Phone Records, phone call from 5:31 p.m. on July 12, 2011, with **Exhibit 6**, showing same phone number written onto Bob Schmidt's card with "John Cordova" appearing directly before it) In a phone conversation that lasted approximately 8 minutes, Greg Parker informed Cordova of (a) PEI's status as a Native American Company; (b) the fact that PEI had Native American Employees and Officers; (c) Randall's actions relating to the Project up to that point; and (d) Greg Parker's belief that such actions could have been motivated by Randall's dislike of affirmative action, or, alternatively, were otherwise motivated by some past animus (the "Initial Complaint").

26. On or about July 13, 2011, Guerra required Greg Parker to sign two apology letters of on behalf of PEI - one to Alf Randall and one to Robert Schmidt - and one letter of reprimand

(the "July 13, 2011 Letters").  Guerra also informed Greg Parker that failure to sign these letters would result in PEI being removed from the Project immediately.

27. Greg Parker signed the July 13, 2011 letters, copies of which are attached to this Complaint as **Exhibit 7**.

28. As a result of the Initial Complaint, PEI was excluded from weekly construction meetings, put on by the County and/or Lafarge which the other subcontractors, Lafarge officials, and County officials attended.  Exceptions to this exclusion occurred when County officials wanted to have a PEI official or employee present to be reprimanded on behalf of the company.

29. As a further result of this Initial Complaint, PEI suffered unprofessional treatment at the hands of Lafarge and the County.

### C. The Interim Treatment

30. From June 28, 2011 through December 7, 2011, Randall and Schmidt continually caused PEI to be treated in an unprofessional manner often with the assistance of Lafarge employees.  Such unprofessional conduct included, but was not limited to, the following: (a) requiring PEI Personnel to set traffic control without signed Methods for Handling Traffic ("MHTs"); (b) frequently directing PEI to conduct work in one manner before changing its position as soon as the same day such a directive had been issued; (c) requiring PEI to conduct rotomilling activities in unsafe conditions; (d) raising the speed limit on roads where rotomilling was being done days after at least one accident occurred due to said unsafe conditions; (e) requiring PEI to do daily job checks necessitated by Randall and/or Schmidt's disregard of PEI's safety advice; (f) requiring PEI to respond to complaints of traffic control problems with unreasonable amounts of notice, on days too cold for Lafarge or County personnel to work,

and/or that were ultimately found to be fictitious; (g) requiring PEI to do work that was in excess of what it had bid and contracted to do without being compensated to do it; and (h) screaming at, cursing at and assaulting PEI personnel.

31. As a result of some of this continual unprofessional treatment, PEI wrote a November 3, 2011 letter to Lafarge again raising the issue of potential race-based discrimination. (*See* **Exhibit 8**, November 3, 2011 Letter to Lafarge). The letterhead of the November 3, 2011 Letter to Lafarge clearly informed the reader that Lafarge is a "Native American Owned Company". It also stated that it was written "to inform [Lafarge] of perceived discrimination" before describing, or attempting to describe, some of the instances of the unprofessional conduct PEI had been subjected to through that date.

32. The unprofessional conduct from Randall and Schmidt continued, often with the assistance of Lafarge, after the mailing of the November 3, 2011 letter.

**D. The December 7, 2011 Complaint of Discrimination And Termination**

33. On or about December 7, 2011, PEI wrote Randall a letter complaining of discrimination. (the "December 7, 2011 Letter", attached as **Exhibit 9**) The letterhead of the December 7, 2011 Letter to Randall clearly informed the reader that PEI is a "Native American Owned Company". While describing, or attempting to describe, some of the instances of the unprofessional conduct PEI had been subjected to through that date, it also stated that "[t]he discrimination shown by Pueblo County towards PEI is unwarranted. Mr. Randall and Mr. Schmidt have made it clear from the beginning of the project that they did not want us to be onsite."

34. PEI transmitted the December 7, 2011 Letter to Randall through Guerra as an intermediary.

35. On or about December 8, 2011, although PEI was exclusively handling the rotomilling work for the Project at the time, Guerra requested a bid from Rocky Mountain Rotomilling ("RMR") to begin rotomilling work on the Project "as soon as [the] next week if [they were] available" (the "December 8, 2011 Bid Request", attached as **Exhibit 10**). On December 9, 2011, RMR submitted a bid to Guerra (the "RMR BID", attached as **Exhibit 11**).

36. Lafarge employee James Wolfe's field notes for December 9, 2011 state "Last Day For Lafarge @ Midnight". (*See* **Exhibit 12**, Excerpts of Wolfe's Field Notes at Pg. 4)

37. On or about Monday, December 12, 2011, Wolfe created a field note stating "First Day With Martin Marietta". (*See* Exhibit 12, Excerpts of Wolfe's Field Notes at Pg. 5)

38. On information and belief, between December 9, 2011 and December 12, 2011, Martin Marietta may have assumed Lafarge's obligations under the Subcontract.

39. On information and belief, between December 9, 2011 and December 12, 2011, Lafarge's employees named or described in this litigation may have become employees of Martin Marietta.

40. On or about Monday, December 12, 2011, Randall complained in writing to Guerra in a one-paragraph letter that Greg Parker "***accuse[d] [Randall's] staff of discrimination against him***" and that "this ***conduct is not acceptable*** for contractors performing work on projects for Pueblo County, nor for their subcontractors". (*See* the "December 12, 2011 Randall Letter", attached as **Exhibit 13** (emphasis added))  The letter then directed Guerra to take "whatever steps you deem appropriate to assure that this conduct does not continue." (*Id.*)

8

41. On or about Monday, December 12, 2011, Guerra wrote a letter on Martin Marietta letterhead, but with a Lafarge signature block, that informed Parker that all subcontractors with contracts in excess of $20,000.00 must have a bond to continue working on the Project (the "December 12, 2011 Guerra Letter", attached as **Exhibit 14**). Because the December 12, 2011 Guerra Letter claimed that PEI was unable to obtain a bond, it stated that PEI's Contract would be terminated, due to PEI's purported inability to obtain a bond. This was in spite of the Subcontract's specific exclusion for any such requirement. (*See* the Subcontract, attached as Exhibit 4, at Article 3 and Attachment B)

42. On or about Tuesday, December 14, 2011 Guerra's subordinates began refusing to sign any PEI Daily Job Report created December 13, 2011 or later. Also on or about this date, Guerra was engaging in correspondence with another company, Work Zone, to have them take over PEI's traffic control responsibilities on the Project. (*See* **Exhibit 15**, December 13-15, 2011 Emails)

43. On or about Thursday, December 15, 2011, Guerra repeated his statements contained in the December 12, 2011 Guerra Letter in a new letter that was both written on Martin Marietta stationary and contained a Martin Marietta signature block. (*See* the "December 15, 2011 Guerra Letter", attached as **Exhibit 16**)

44. On or about Friday, December 16, 2011, Guerra informed PEI that if it did not vacate the Project by December 17, 2011, then PEI traffic control devices and equipment from the Project would be removed. (*See* the "December 16, 2011 Guerra Letter", attached as **Exhibit 17**)

9

45. On information and belief, on or after Saturday, December 17, 2011, Rocky Mountain Rotomilling took over the remaining portion of PEI's rotomilling work on the Project and another company, Work Zone, took over PEI's traffic control duties.

46. At or about 5:00 a.m. on Saturday, December 17, 2011, Martin Marietta or Lafarge employees removed PEI's equipment from the job site. (*See* Exhibit 12, Excerpts of Wolfe's Field Notes at Pg. 8)

47. At about 6:00 a.m. on Saturday, December 17, 2011, PEI went to the Project to secure its equipment and signs, only to find that its equipment and signs, except for several specialty signs, had already been removed from the Project site.

48. On or about December 17, 2011, Martin Marietta and/or Lafarge terminated, or caused to be terminated, PEI's Subcontract.

### E. The Post-Termination, And Other Discrimination

#### a. *RMR's Lack Of A Bond*

49. In December of 2011, the County, Martin Marietta and/or Lafarge claimed, superficially, that PEI would be removed, and/or eventually was removed, from the Project because as a subcontractor with a subcontract of value greater than $20,000.00 it was required to have a bond for work covered under its Subcontract. (*See* Exhibit 14; Exhibit 16; Exhibit 17; and **Exhibit 18**, Excerpts Of Pierson Project Diary)

50. On information and belief, RMR had a contract to work on the Project that had a value in excess of $20,000.00. (*See* Exhibit 11 (stating that Rocky Mountain Rotomilling (a) would bid $6.88 a cubic yard; (b) that Rocky Mountain Rotomilling was bidding to do, per Guerra, 3,923 cubic yards; and (c) for an implied total of $26,990.24 for the milling alone)).

RMR also stated, that per Guerra's estimate of four necessary mobilizations at $1,500.00 a mobilization, they would need an additional $6,000.00 for mobilization purposes. (Compare *id.*, which states that each mobilization would be $1,500.00 *with* Exhibit 10, which states that Guerra expected "4 MOBES/BUT MAY HAVE MORE.")

51. On information and belief, Martin Marietta never required that RMR obtain a bond to work on the Project.

### b. Work Zone's Contract And Bond Anomalies

52. Prior to PEI being removed from the Project, Work Zone subcontracted with Lafarge to handle Erosion Control, Seeding, and Non-temporary traffic control signage for $101,057.46. (*See* **Exhibit 19**, the "First Work Zone Subcontract").

53. On or about December 17, 2011, on information and belief, Work Zone and Martin Marietta agreed to a contract to have Work Zone handle the remaining Traffic Control Work for the Project for an initial price of $96,400.00. (*See* **Exhibit 20**, the "Second Work Zone Subcontract" at Pg. 1.) This price included a stated cost of $1,500.00 to obtain a bond. (*Id.*)

54. On information and belief, in or about July 2012, the Project was complete.

55. On information and belief, Work Zone handled Traffic Control for the Project from the termination of PEI's contract on or about December 17, 2011 until the Project's completion.

56. On or about October 29, 2012, PEI filed an action in Pueblo District Court naming Lafarge and Martin Marietta as defendants for, amongst other things, breaching its subcontract (the "State Court Complaint").

57. Within Martin Marietta's documents produced in the litigation commenced by the State Court Complaint is a document purporting to be a bond (a) from AMCO Insurance Company, Bond Number BDA718283; (b) on behalf of Work Zone; (c) in favor of Lafarge; (d) in the amount of $101,057.46, which is the same amount as the First Work Zone Subcontract but not the Second Contract Amount; (e) being effective July 15, 2011 or approximately five months before Work Zone assumed, in agreement with Martin Marietta, PEI's traffic control duties under the Project. (*See* the "Work Zone Bond Documents", attached as **Exhibit 21** at Pg. 1). Martin Marietta's documents also contain a "Dual Obligee Rider" that purports to add Martin Marietta to said bond for the consideration of $1.00. (*See id.* at Pg. 2)

58. The Work Zone Bond Documents purport to insure work contracted for under the First, not the Second, Work Zone Subcontract.

59. On information and belief, Work Zone never obtained a bond to handle the work it agreed to do for Martin Marietta on the Second Work Zone Contract.

    c. **The County's Different Treatment Of Work Zone Vis-À-Vis PEI**

60. On information and belief, Randall treated Work Zone more professionally than PEI had been treated.

61. On information and belief, PEI was treated differently than Work Zone because PEI is a Native American, by race, Company.

    d. **Different Treatment Of PEI In Terms Of Handling Change Orders**

62. PEI submitted multiple change orders during the course of the Project to compensate it for County directives that it was forced to follow that were not in the Project Specifications.

63. Such change orders were submitted to Lafarge and related to the items alleged in this Complaint.

64. Lafarge, per County instruction, required PEI to submit extensive documentation with its change orders.

65. PEI change orders were almost all wrongfully rejected.

66. PEI has wrongfully not been paid on a single change order.

67. On information and belief, other subcontractors on the Project were paid on change orders they submitted without the same documentation requirements that PEI was forced by County personnel including Randall, through Lafarge, to provide.

68. On information and belief, Randall and Lafarge handled PEI change orders differently on account of PEI's status as a Native American Company and/or a company with Native American employees.

### e. *Martin Marietta And Randall's Retaliation, Against PEI, Post-Contract Termination*

69. Defendant Martin Marietta, through its employees, has refused to do business with PEI after it or Lafarge terminated PEI's Subcontract. On information and belief, such refusal to do business is on account of PEI's complaint of discrimination contained in the December 7, 2011 letter.

70. On information and belief, Defendant Randall has prevented the County from doing business with PEI after Martin Marietta or Lafarge terminated PEI's Subcontract. On information and belief, Randall has prevented the County from doing business with PEI on account of (a) PEI's status as a Native American, by race, company; (b) the fact that it has Native

American, by race, company officers; and (c) its complaints of discrimination described in part in this Complaint.

## IV. FIRST CLAIM FOR RELIEF
### (Retaliation Under Section 1981 – Against All Defendants)

71. PEI incorporates the foregoing paragraphs of its Complaint, as if set forth verbatim herein.

72. At all times relevant to this Complaint there were federal laws clearly establishing PEI's rights to be free of racial discrimination and retaliation for complaining about racial discrimination, including 42 U.S.C. § 1981 ("Section 1981").

73. Section 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens". It also defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

74. PEI is a Native American, by race, Company.

75. PEI engaged in protected activity under 42 U.S.C. § 1981 ("Section 1981") when it made a complaint or complaints of racial discrimination.

76. Defendants took, or caused to be taken, adverse actions against PEI because of PEI's protected activity and/or race.

77. Defendants had the specific intent to retaliate against PEI because PEI complained of racial discrimination.

American, by race, company officers; and (c) its complaints of discrimination described in part in this Complaint.

## IV. FIRST CLAIM FOR RELIEF
### (Retaliation Under Section 1981 – Against All Defendants)

71. PEI incorporates the foregoing paragraphs of its Complaint, as if set forth verbatim herein.

72. At all times relevant to this Complaint there were federal laws clearly establishing PEI's rights to be free of racial discrimination and retaliation for complaining about racial discrimination, including 42 U.S.C. § 1981 ("Section 1981").

73. Section 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens". It also defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

74. PEI is a Native American, by race, Company.

75. PEI engaged in protected activity under 42 U.S.C. § 1981 ("Section 1981") when it made a complaint or complaints of racial discrimination.

76. Defendants took, or caused to be taken, adverse actions against PEI because of PEI's protected activity and/or race.

77. Defendants had the specific intent to retaliate against PEI because PEI complained of racial discrimination.

78. Defendants' actions, or actions it caused to be taken, that are complained of herein, were materially adverse to PEI and well might dissuade a reasonable contractor, subcontractor, employee, or other person or entity from making a discrimination complaint.

79. PEI suffered adverse actions that had immediate, practical, and tangible adverse effects amounting to a significant change in PEI's subcontractor status.

80. There exists a causal connection between PEI's protected activity and Defendants' material adverse actions, or actions Defendants caused to be taken.

81. The foregoing conduct constitutes intentional illegal retaliation prohibited by Section 1981.

82. As a direct, foreseeable, and proximate result of said wrongful acts by Defendants, PEI suffered and will continue to suffer damages that include, but are not limited to, damage to its reputation, the loss of good will, damage to future bonding capacity, the consequences of the wrongfully terminated contract including unnecessary labor and costs incurred due to the harassment on the Project, lost pay, lost profits, the time and expense of defending PEI's name and reputation, inconvenience and other compensatory damages to be proven at trial.

83. As a further direct, foreseeable, and proximate result of said wrongful acts by Defendants, PEI has incurred attorneys' fees in an amount to be determined, to which they are entitled pursuant to 42 U.S.C. §1988.

84. The unlawful actions taken against PEI, as alleged herein, were taken in malicious, willful, wanton, reckless indifference to, and reckless disregard of PEI's rights as

guaranteed by Section 1981. PEI is thereby entitled to an award of punitive damages against Defendants in an amount to conform to the proof at trial.

85. Further, PEI requests prejudgment interest on all damages.

## V. SECOND CLAIM FOR RELIEF
### (Discrimination Under Sections 1981, And 1983 Through Section 1981, Against Defendant Randall)

86. PEI incorporates the foregoing paragraphs of its Complaint, as if set forth verbatim herein.

87. 42 U.S.C. § 1983 ("Section 1983") provides that every person who, under color of law, subjects or causes to be subjected, any person to the deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws shall be liable to the party injured.

88. At the time of Defendant Randall's actions complained of herein, there were federal laws clearly establishing PEI's rights to be free from racial discrimination, including Section 1981.

89. Defendant Randall was a state actor acting under color of government authority during times relevant to this complaint.

90. Defendant Randall, through his unprofessional actions, had the specific intent to discriminate against PEI, on account of PEI's racial status as a Native American Company.

91. Such discrimination caused the Subcontract to be either modified, terminated, and/or interfered with the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship created by the Subcontract. The foregoing conduct constitutes intentional illegal retaliation prohibited by Sections 1981 and 1983.

92. As a direct, foreseeable, and proximate result of said wrongful acts by Defendants, PEI suffered and will continue to suffer damages that include, but are not limited to, damage to its reputation, the loss of good will, damage to future bonding capacity, the consequences of the wrongfully terminated contract including unnecessary labor and costs incurred due to the harassment on the Project, lost pay, lost profits, the time and expense of defending PEI's name and reputation, inconvenience and other compensatory damages to be proven at trial.

93. As a further direct, foreseeable, and proximate result of said wrongful acts by Defendants, PEI has incurred attorneys' fees in an amount to be determined, to which they are entitled pursuant to 42 U.S.C. § 1988.

94. The unlawful actions taken against PEI, as alleged herein, were taken in malicious, willful, wanton, reckless indifference to, and reckless disregard of PEI's rights as guaranteed by Sections 1981 and 1983. PEI is thereby entitled to an award of punitive damages against Defendants in an amount to conform to the proof at trial.

95. Further, PEI requests prejudgment interest on all damages.

## VI. THIRD CLAIM OF RELIEF
### (Retaliation Under Section 1983 Through Section 1981
### Against Defendants Randall and Schmidt)

96. PEI incorporates the foregoing paragraphs of its Complaint, as if set forth verbatim herein.

97. Defendants Randall and Schmidt were state actors acting under color of government authority during times relevant to this complaint.

98. At all times relevant to this Complaint there were federal laws clearly establishing PEI's rights to be free of racial discrimination and retaliation for complaining about racial discrimination, including Section 1981.

99. PEI engaged in protected activity under Section 1981 when it made a complaint or complaints of racial discrimination.

100. At the time of Defendants Randall and Schmidt's actions complained of herein, there were federal laws clearly establishing PEI's rights to be free from retaliation for complaining about racial discrimination, including Section 1981.

101. Defendants Randall and Schmidt took, or caused to be taken, adverse actions against PEI because of PEI's protected activity and/or race.

102. Defendants Randall and Schmidt had the specific intent to retaliate against PEI because PEI complained of racial discrimination.

103. Defendants Randall and Schmidt's actions, or actions it caused to be taken, that are complained of herein, were materially adverse to PEI and well might dissuade a reasonable contractor, subcontractor, employee, or other person or entity from making a discrimination complaint.

104. PEI suffered adverse actions that had immediate, practical, and tangible adverse effects amounting to a significant change in PEI's subcontractor status.

105. There exists a causal connection between PEI's protected activity and Defendants Randall and Schmidt's material adverse actions, or actions Defendants Randall and Schmidt caused to be taken.

106. The foregoing conduct constitutes intentional illegal retaliation prohibited by Sections 1981 and 1983.

107. As a direct, foreseeable, and proximate result of said wrongful acts by Defendants Randall and Schmidt, PEI suffered and will continue to suffer damages that include, but are not limited to, damage to its reputation, the loss of good will, damage to future bonding capacity, the consequences of the wrongfully terminated contract including unnecessary labor and costs incurred due to the harassment on the Project, lost pay, lost profits, the time and expense of defending PEI's name and reputation, inconvenience and other compensatory damages to be proven at trial.

108. As a further direct, foreseeable, and proximate result of said wrongful acts by Defendants, PEI has incurred attorneys' fees in an amount to be determined, to which they are entitled pursuant to 42 U.S.C. §1988.

109. The unlawful actions taken against PEI, as alleged herein, were taken in malicious, willful, wanton, reckless indifference to, and reckless disregard of PEI's rights as guaranteed by Sections 1981 and 1983. PEI is thereby entitled to an award of punitive damages against Defendants in an amount to conform to the proof at trial.

110. Further, PEI requests prejudgment interest on all damages.

### VII. JURY DEMAND

PEI hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

### VIII. PRAYER FOR RELIEF

For judgment against Defendants Lafarge West, Inc., Martin Marietta Materials, Inc., Nick Guerra, Alf Randall, and Bob Schmidt jointly and severally, in the amount to be proven at trial to compensate the Plaintiff for the discrimination and retaliation they suffered and all incidental damages as allowed by law, plus pre- and post-judgment interest as allowed by law, costs and attorney's fees, and all such further relief as the Court deems just and proper.

Respectfully submitted this 30th day of May, 2014.

 *s/ Elliot D. Fladen*
Elliot D. Fladen
Colorado Bar Registration No. - 36784
SCHLUETER, MAHONEY & ROSS, P.C.
999 18th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 292-4525
Fax: (303) 292-1229
E-mail: Elliot@smrlaw.net
ATTORNEYS FOR PLAINTIFF
PARKER EXCAVATING, INC.

Plaintiff's Address:
1428 Stockyard Road
Pueblo, Colorado 81001